UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THERESA CHICKLAS, DAWN BERGEN,
and LYNN M. MAISON AS
CONSERVATOR FOR NICK KATHER,

Case No. 07-12997

Honorable Nancy G. Edmunds

Plaintiff(s),

v.

JEFFREY DOUGLAS HENDRICKS,
DENNIS RANSOME, and HURON VIEW
EXPRESS (2005) LIMITED,

Defendant(s).
_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF CHICKLAS [45] AND PLAINTIFF BERGEN [42]**

Plaintiffs Theresa Chicklas, Dawn Bergen, and Lynn M. Maison as conservator for Nick Kather filed this negligence action against Defendants Jeffery Douglas Hendricks, Dennis Ransome, and Huron View Express (2005) Limited.[1] Defendants assert that Plaintiffs Chicklas and Bergen are not entitled to recovery because they cannot establish a threshold injury as required under Michigan's No Fault Act, Mich. Comp. Laws § 500.3101 *et seq.* This matter comes before the Court on Defendants' motions for summary

---

[1] Plaintiffs' initial complaint listed Nick Kather as a Plaintiff and Huron View Express Limited as a Defendant. (Docket Text # 1.) Plaintiffs filed an amended complaint to substitute Plaintiff Lynn M. Maison (as conservator for Nick Kather) for Nick Kather and to substitute Defendant Huron View Express (2005) Limited for Huron View Express Limited. (Docket Text # 34.)

judgment with respect to Plaintiffs Chicklas and Bergen.² For the reasons set forth below, the motions are DENIED.

**I.     Facts**

This case arises out of a multi-car pileup that occurred on January 28, 2007, in Lapeer, Michigan. Plaintiffs Chicklas and Bergen allege that they sustained serious, life-altering injuries as a result of the accident. In order to assess the merits of Plaintiffs' claims, the Court must consider each Plaintiff's health and lifestyle both before and after the accident.

**A. Plaintiff Chicklas**

Plaintiff Chicklas was eighty-two years old at the time of the accident. (Pl.'s Resp. at 4.)³ At that point in time, she lived alone. (Defs.' Mot., Ex. C at 420, 492, 494.) In the years preceding the accident, Chicklas had enjoyed ballroom dancing. (Pl.'s Resp. at 4.) Before the accident, however, her ability to dance had been severely limited due to a number of surgeries.

As early as 2002, Chicklas complained about severe pain in her right knee. (Defs.' Mot., Ex. E.) This caused her "to discontinue her dancing activities and prolonged standing and walking." (*Id.*) She also experienced problems with her left knee; it was surgically replaced in November 2005. (Defs.' Mot. at 2; Pl.'s Resp. at 4.) While she was recovering, she fell and broke her hip. (*Id.*) Her hip was partially replaced in January 2006. (*Id.*) After

---

²The motions were filed by Defendants Ransome and Huron View Express (2005) Limited. Defendant Hendricks concurred with both motions. (Docket Text ## 57, 58.)

³All references to "Motion" and "Response" in this section refer to the pleadings related to Plaintiff Chicklas.

the hip replacement, Chicklas suffered a series of falls due to instability in her right knee and because her "legs just gave out." (Defs.' Mot., Ex. B at 50, 51.) Ultimately, Chicklas' right knee was replaced as well, in September 2006. (Defs.' Mot. at 4; Pl.'s Resp. at 4.)

Less than two months after her right knee replacement, Chicklas could walk independently with a standard walker, and she could walk using a "large base quad cane" with "standby assistance." (Defs.' Mot., Ex. B at 90.) She could prepare meals and was independent in self-care activities. (*Id.*) She was unable to drive, however, and required assistance with household chores. (*Id.*) Chicklas' Doctor, Ronald T. Rook, stated in an affidavit that on January 8, 2007, Chicklas was able to walk with the assistance of a cane and was functioning independently. (Docket Text # 59 ¶¶ 10, 11.) Additionally, he stated that Chicklas "did not have any neurologic deficits." (*Id.* ¶ 12.)

Twenty days later, Chicklas was involved in the accident that forms the basis of this suit. She suffered a fractured femur, radius (forearm), and ribs.[4] (Defs.' Mot., Ex. G.) She also suffered a scalp laceration. (Defs.' Mot., Ex. H.) A CT scan of Chicklas' head revealed calcification, atrophy, and decreased density. (Defs.' Mot., Ex. G at 28.) A review of the scan described the atrophy as "age-consistent." (Defs.' Mot., Ex. H at 279.) This type of atrophy had been detected in Chicklas as early as 1991. (Defs.' Mot., Ex. I at 370.)

---

[4]Chicklas also claims that she suffered a left clavicle fracture, an L2 (spine) fracture, and a fractured wrist. (Pl.'s Resp. at 5.) Nothing in her medical records, however, indicates a clavicle fracture. (Defs.' Mot., Ex. G.) With respect to a lumbar fracture, the record contains no tests from the day of the accident that report this injury. A CT scan of her cervical spine conducted that day revealed no fractures (*id.* at 29); however, subsequent medical notes do reference a lumbar fracture. (*See, e.g.,* Defs.' Mot., Ex. H at 508.) Additionally, while an x-ray of her right wrist revealed a distal radial fracture (*id.* at 25-26), this is the same fracture that constituted Chicklas' forearm fracture. (*See id.* at 19-20) (notes from forearm x-ray indicated "[d]istal radial fracture as described on the wrist x-rays").

The CT scan did not reveal any internal hemorrhage.  (Defs.' Mot., Ex. H at 280.)  A subsequent scan revealed "no acute bleed, mass effect or midline shift," but did note "mild diffuse cerebral atrophy."  (*Id.* at 353.)

Chicklas was taken to Hurley Medical Center, where she remained until February 28, 2007.  (Defs.' Mot. at 5; Pl.'s Resp. at 5.)  While at Hurley, Chicklas' "nurses kept very detailed notes on the type of assistance [Chicklas] needed or was given."  (Defs.' Mot. at 7.)  Contrary to Defendants' assertion, these notes do not indicate that Chicklas "was independent with bladder and bowel [and] only required minimal assistance with clothing her lower extremities."  (*Id.*)  Rather, the notes indicate that while Chicklas was continent, she needed "help & clothing before & after" using the toilet.  (Defs.' Mot., Ex. H at 652.)  The notes also indicate that Chicklas needed only incidental help with dressing her upper extremities, but needed "help to hold & perform" dressing her lower extremities.  (*Id.*)  Further, the notes reveal that Chicklas was not walking and that she needed "assist & locomotion" in a wheelchair.  (*Id.*)

With respect to her mental capacity, the Hurley medical records reveal that Chicklas began to experience confusion, disorientation, dementia, delirium, and short term memory loss.  (*Id.* at 490, 508.)  Chicklas underwent a neuropsychological assessment.  The results state that Chicklas' "hospital course has been complicated by delirium which was most likely related to some of the sedating medications as well as the trauma itself."  (*Id.* at 510.)  The report continues, "overall the test results to [sic] confirm that the patient most likely has an underlying dementia which has been exacerbated by the multitrauma she sustained."  (*Id.*)

Chicklas was discharged on February 28, 2007, and her discharge form indicates that she "needs assist" in every listed category, including self care and bowel and bladder management. (*Id.* at 559.) The form also states that Chicklas needed "moderate assist for basic transfers" and was "able to walk 4 ft maximally with assist of 2 people using platform walker." (*Id.*)

Upon her discharge, Chicklas was transferred to the Shelby Nursing Center. (Defs.' Mot. at 7; Pl.'s Resp. at 5.) The Shelby records indicate that Chicklas' ability to care for herself and to walk increased markedly during her time at the facility. For instance, the "Weekly Progress Note" dated April 25, 2007, reports that Chicklas did not need any help going to the bathroom when she used her rolling walker. (Defs.' Mot., Ex. I at 221). The Note also stated that Chicklas was moving toward increased independence. (*Id.*) She still was not considered independent, however, when it came to toileting and certain types of dressing and transfers. (*Id.*) Similarly, the "Narrative Progress Notes" from May 28 and May 30 report that Chicklas walked 200 feet with a rolling walker. (*Id.* at 239-40.)

In June 2007, Chicklas underwent another neuropsychological evaluation. (*Id.* at 368.) The evaluation states that "five months after a traumatic brain injury and multiple injuries to other parts of the body, Theresa Chicklas presented with findings of mild to moderate neuropsychological deficits. . . . The deficit pattern was consistent with her injury history." (*Id.* at 374.) The "diagnostic impression" was reported as "dementia due to traumatic brain injury." (*Id.* at 375.)

On July 7, 2007, Chicklas was transferred to Pine Ridge, a facility that provides room and board as well as in-house nursing, attendant, and medical care. (Pl.'s Resp. at 5.) Chicklas claims that while at Pine Ridge, she fell twice, on January 15 and on March 26,

5

2008. (Pl.'s Resp. at 5.) Currently, and apparently as a result of those falls, Chicklas requires assisted care 24 hours per day, 7 days per week. (Pl.'s Resp., Ex. 4 ¶ 11.) She is unable to walk and is totally reliant on her wheelchair.[5] (Id. ¶ 13B.) She has to be lifted in and out of the wheelchair, and she needs assistance bathing and grooming. (Id. ¶ 13 A, D-F.)

**B. Plaintiff Bergen**

Plaintiff Bergen was forty-one years old at the time of the accident.[6] (See Pl.'s Resp., Ex. 7.)[7] Before the accident, Bergen worked at a K-mart deli counter between twenty and forty hours per week. (Pl.'s Resp. at 4.) She began working for K-mart in March 2005. (Pl.'s Resp., Ex. 1 at 7.) In August 2005, Bergen injured her right elbow and missed some work as a result. (Defs.' Mot. at 1; Pl.'s Resp. at 4.) An x-ray of Bergen's cervical spine at that time revealed minimal spondylosis[8] of C5, C6, and C7, and slight disc space narrowing between C6 and C7. (Defs.' Mot, Ex. B.) In December 2005, Bergen was

---

[5]Chicklas' son, George Chicklas, testified in February of 2008 that his mother used a walker to get out of bed and to move in her room, but that she needed a wheelchair whenever she would leave the room. (Defs.' Mot., Ex. J at 73.) This testimony was given before Chicklas' fall of March 26, 2008, which Chicklas asserts led to her current physical condition. (Pl.'s Resp. at 5-6.)

[6]The record is inconsistent with respect to Bergen's birth date. Her brief states that she is thirty-eight (Pl.'s Resp. at 4), her deposition testimony states that she was born in 1960 (Pl.'s Resp., Ex. 1 at 5), and her medical records state that she was born in 1966. Given that some of her medical records are written and signed in Bergen's own hand, the Court believes that the date contained in the records is most likely correct.

[7]All references to "Motion" and "Response" in this section refer to the pleadings related to Plaintiff Bergen.

[8]"Spondylosis" is "a general term for degenerative changes due to osteoarthritis" and "refers to a normal aging process which occurs from wear and tear throughout an individual's life." The Sloane-Dorland Annotated Medical-Legal Dictionary 663 (1987).

permitted by her doctor to return to work with limited use of her right elbow. (Defs.' Mot., Ex. A at 53.) In September 2006, Bergen was restricted from lifting anything over 5 pounds at work. (*Id.* at 52.)

In October 2006, Bergen went to Port Huron Hospital for her elbow problems. (*Id.* at 56.) On the "Patient Intake Summary," Bergen reported that the pain associated with her elbow interfered with her work "extremely"; limited her ability to move a table, push a vacuum cleaner, and lift and carry items like groceries "a lot"; and that she could take care of herself and drive "but it hurts." (*Id.* at 50.) Her "Patient Discharge Summary," dated November 24, 2006, listed the elbow problem as "severe." (*Id.* at 57.)

The day of the accident, Bergen was taken to Mercy Hospital, where she complained of neck and back pain. (Defs.' Mot. at 2; Pl.'s Resp. at 5.) Three days later, Bergen followed up with her doctor, who prescribed pain killers and muscle relaxers. (*Id.*) The next month, Bergen began a two month course of physical therapy. (Pl.'s Resp., Ex. 3.) In March 2007, Bergen underwent an MRI; the results revealed that "there may be some very minimal asymmetric disc bulging into the left paracentral region at L4/5." (Pl.'s Resp., Ex. 4.) During this time, Bergen did not return to work.

Bergen was referred to Dr. Nick Reina for a consultation. (Pl.'s Resp., Ex. 5.) Dr. Reina examined Bergen, and his initial impression was that she had "diffuse back pain/strain syndrome." (*Id.*) After a follow-up visit the next month, Dr. Reina noted that Bergen was "having difficulty tolerating therapy" and that he would "allow her to remain off work." (Defs.' Mot., Ex. H at 44.) He also stated that he was "really unable to explain the persistence and severity of her pain." (*Id.*) In June 2007, Bergen reported that her back pain was getting worse. (*Id.* at 41.) Dr. Reina stated that he had "done maximum

treatment" and could "think of no specific things to add." (*Id.*) He decided to "allow a trial of return to work but will limit lifting to 20 lbs and limit bending or twisting at the waist . . . . They should allow sitting down perhaps 5 minutes per hour." (*Id.*) He recognized that such restrictions might not be approved by her employer. (*Id.*) He was correct; in his July report, Dr. Reina noted that Bergen's employer had not "allowed her to return to work with the restrictions." (*Id.* at 25.)

In August 2007, Dr. Reina noted that Bergen had undergone a "Functional Capacity Evaluation." (*Id.* at 5.) He stated that she "really performed less than sedentary" and that "[w]ith regard to work the patient appears incapable of event [sic] sedentary work and currently appears to be at maximum medical improvement." (*Id.*) Indeed, the Evaluation noted that "the client is incapable of sustaining the sedentary level of work for an 8-hour day."[9] (Defs.' Mot., Ex. I at 8.) The Evaluation concluded that Bergen's abilities did not match the self-reported requirements of her job. (*Id.* at 11.)

In April 2008, Bergen was examined by two doctors who came to vastly different conclusions. Dr. Wilbur Boike found "no evidence of paraspinal muscle spasm or deformity involving the cervical, thoracic, or lumbosacral spine regions." (Defs.' Mot., Ex. J.) He stated that "[t]here is no objective clinical evidence of neurological or spinal impairment or disability" and that he did "not believe disc bulging is a result of her motor vehicle accident." (*Id.*) He concluded that Bergen "can perform normal and unrestricted work and recreational activities." (*Id.*)

---

[9]Defendants emphasize that during the evaluation, Bergen "self-limited participation by stopping on 5 out of 21 tasks." (Defs.' Mot. at 3.) The Evaluation concluded, however, that because Bergen had a "tight and spasmed back" and "was unable to tolerate even light touch," it was "understandable that she self-limited." (Defs.' Mot., Ex. I at 10.)

8

Dr. Mark Rottenberg, on the other hand, concluded that "[as] a direct result of [the] accident, the patient suffered traumatic jarring, which caused her to become symptomatic with regards to development of disc pathology with muscular problems in the neck, as well as some disc problems with muscular problems in the back." (Pl.'s Resp., Ex. 6; Docket Text # 63.) Dr. Rottenberg noted that x-rays revealed "a reversal of normal cervical lordosis[10] with C5-6 and marked C6-7 disc space narrowing," thoracic "kyphosis,"[11] and disc space narrowing in the cervical, thoracic, and lumbosacral regions. (*Id.*) He also reported that electrodiagnostic testing indicated radiculopathy[12] and "some peripheral slowing consistent with sensory nerve root involvement." (*Id.*) His conclusions were as follows:

   1. Neck pain with cervical disc pathology and cervical strain with myofascial pain.

   2. Back pain with thoracic disc pathology and thoracic strain.

   3. Low back pain with symptomatic lumbosacral disc pathology, sciatica with right S1 lumbosacral radiculopathy, as well as some left L5 lumbar radiculopathy and lumbosacral strain as well as lumbosacral sprain with right S-I joint involvement.

   4. Right hip pain with right trochanteric bursitis as well as degenerative changes involving the right hip.

   5. Sleep disturbance secondary to physical injury.

   6. Bilateral carpal tunnel syndrome.

---

[10]"Lordosis" is "the anterior concavity in the curvature of the lumber [sic] and cervical spine as viewed from the side." The Sloane-Dorland Annotated Medical-Legal Dictionary 420 (1987).

[11]"Kyphosis" is "abnormally increased convexity in the curvature of the thoracic spine as viewed from the side." *Id.* at 401.

[12]"Radiculopathy" is "disease of the nerve roots." *Id.* at 601.

(*Id.*)

Bergen testified that before the accident, she was responsible for everyday household chores and "a lot of the outdoor chores, too." (Pl.'s Resp., Ex. 1 at 41-42.) She also groomed, bathed, and dressed herself without assistance. (*Id.*) Additionally, she occasionally would bowl, dance, and go to the shooting range. (*Id.* at 46-47.) Currently, Bergen asserts that she has been unable to return to work. (Pl.'s Resp. at 5.) She also claims that she is now limited in her ability to cook, maintain the house, and do laundry; needs help with grooming, bathing, and dressing; and can no longer dance, bowl, or go shooting. (Pl.'s Resp., Ex. 1 at 42-50.)

These matters are now before the Court on Defendants' motions for summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Analysis

Under Michigan's No Fault Act, "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(1). At issue in this case is whether Plaintiffs have suffered a "serious impairment of body function," which is defined as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." *Id.* at (7).

The Michigan Supreme Court set forth the following framework to determine whether this standard has been met:

> First, a court must determine that there is no factual dispute concerning the nature and extent of the person's injuries; or if there is a factual dispute, that it is not material to the determination whether the person has suffered a serious impairment of body function. . . .
>
> Second, if a court can decide the issue as a matter of law, it must next determine if an "important body function" of the plaintiff has been impaired. . . . If a court finds that an important body function has in fact been impaired,

11

> it must then determine if the impairment is objectively manifested. Subjective complaints that are not medically documented are insufficient.
>
> If a court finds that an important body function has been impaired, and that the impairment is objectively manifested, it then must determine if the impairment affects the plaintiff's general ability to lead his or her normal life. In determining whether the course of the plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life. Once this is identified, the court must engage in an objective analysis regarding whether any difference between the plaintiff's pre- and post-accident lifestyle has actually affected the plaintiff's "general ability" to conduct the course of his life. Merely "*any* effect" on the plaintiff's life is insufficient because a *de minimis* effect would not, as objectively viewed, affect the plaintiff's "general ability" to lead his life.

*Kreiner v. Fischer*, 683 N.W.2d 611, 625-26 (Mich. 2004) (emphasis original).

For purposes of these motions, Defendants do not contest causation or liability; instead, they argue that Plaintiffs have not sustained the necessary threshold injuries to recover tort-related damages. Specifically, Defendants argue that neither Plaintiff has established that her alleged injuries have affected her general ability to lead her normal life. Additionally, Defendants assert that Plaintiff Bergen's alleged impairments are not objectively manifested. The Court will address each Plaintiff's claim in turn.

### A. Plaintiff Chicklas' Claim

In their motion, Defendants do not dispute the nature and extent of the injuries Chicklas sustained in the accident. (Defs.' Mot. at 5.) Nor do they challenge the existence of an objectively manifested impairment of an important body function. (*Id.* at 12.) Defendants' argument with respect to Chicklas thus focuses solely on whether the impairment has affected Chicklas' general ability to lead her normal life.

The Court's inquiry on this point is:

12

partially objective and partially subjective . . . . [W]hat is normal is to be determined subjectively on the basis of the plaintiff's own life and not the life of some objective third party. However, once that is fixed as the base, it is to be objectively determined whether the impairment in fact affects the plaintiff's 'general ability to lead' that life.

*Kreiner*, 683 N.W.2d at 619 n.7.

In *Kreiner*, the Michigan Supreme Court held that for an injury to affect a plaintiff's "general ability to lead [a] normal life," it must impact the "course or trajectory" of "a plaintiff's entire normal life." *Id.* at 625. And as noted above, "[m]erely '*any* effect' on the plaintiff's life is insufficient because a *de minimis* effect would not, as objectively viewed, affect the plaintiff's 'general ability' to lead his life." *Id.* at 626 (emphasis original). That said, it is not necessary that every aspect of a plaintiff's life change in order for her to be eligible for non-economic tort damages. *Id.* at n.16.

The *Kreiner* court continued:

> The following nonexhaustive list of objective factors may be of assistance in evaluating whether the plaintiff's "general ability" to conduct the course of his normal life has been affected: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery.

*Id* at 626.[13]

---

[13]In a footnote to factor (d) ("the extent of any residual impairment"), the *Kreiner* court stated that "[s]elf-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain, do not establish this point." *Kreiner*, 683 N.W.2d at 626 n.17. Defendants seek to apply this footnote broadly to the entire question of whether Chicklas' injuries have affected her ability to lead her normal life. (*See* Defs.' Mot. at 13) (arguing that "a plaintiff who has restricted themself [sic] from activities will not meet the threshold"). It is clear from the *Kreiner* opinion, however, that the footnote applies only to factor (d), and not more broadly to the entire question of a threshold injury. In fact, the *Kreiner* court cautioned that the "list of factors is not meant to be exclusive nor are any of the individual factors meant to be dispositive by themselves." *Kreiner*, 683 N.W.2d at 626.

The Court's inquiry with respect to Chicklas' pre-accident life is complicated by the numerous surgical procedures Chicklas underwent in the fifteen months leading up to the accident. Defendants argue that the Court must take into account the limitations Chicklas encountered as a result of the surgeries. The Court agrees.

In *Benefiel v. Auto-Owners Insurance Co.*, 745 N.W.2d 174 (Mich. Ct. App. 2008), the Michigan Court of Appeals applied the *Kreiner* analysis to a plaintiff who had sustained multiple injuries in the course of two separate accidents. The lawsuit was based on injuries the plaintiff claimed he sustained as a result of the second accident, and the *Benefiel* court had to decide "what time frame to consider for purposes of comparing plaintiff's normal lifestyles before and after the second accident." *Id.* at 177. The court reasoned:

> Our analysis of plaintiff's lifestyles before and after the second automobile accident lifestyle necessarily requires us to consider plaintiff's injuries, functional deficiencies, and activity limitations existing before the second automobile accident because they may have a direct effect on what constitutes plaintiff's 'normal life.'

*Id.* at 178.

Similarly, this Court's inquiry into Chicklas' pre-accident lifestyle must consider the "functional deficiencies" and "activity limitations" that existed as a result of her multiple surgeries. In November 2006, after Chicklas had undergone a replacement of her hip and both knees, she was discharged from physical therapy. (Defs.' Mot., Ex. B at 90.) She had plateaued in her recovery and response to physical therapy, and "obvious functional restrictions remain[ed] significant in her condition due to the inability to progress to a standard cane." (*Id.* at 90-91.) Nonetheless, by January 2007, she was able to walk with the assistance of a cane, could function independently, and did not have any neurologic deficits. (Docket Text # 59 ¶¶ 10, 11.) Thus, viewing the evidence in the light most

14

favorable to Chicklas, her pre-accident lifestyle included the ability to walk and to function independently.

Defendants argue that Chicklas' current physical condition is essentially identical to her pre-accident condition. It is true that Chicklas' physical condition improved while she was at the Shelby Nursing Center. She was moving toward independence in self-care activities and was able to walk 200 feet with a rolling walker. Despite the progress achieved in early 2007, Chicklas' current physical condition is significantly worse. She is unable to walk and is totally reliant on her wheelchair. She needs assistance 24 hours per day, 7 days per week, including assistance with bathing and grooming, and there is no indication in the record that her condition is expected to improve. These changes in Chicklas' lifestyle are sufficient to establish that her injuries have affected her general ability to lead her normal life.[14]

In addition to physical injuries, the record also suggests that Chicklas has suffered mental infirmities as a result of the accident. Because Chicklas' physical injuries are sufficient to defeat Defendants' motion, however, it is not necessary for the Court to address whether these alleged mental injuries have affected the ordinary course of Chicklas' normal life.

---

[14]The record suggests that Chicklas' condition worsened after she suffered two falls earlier this year. To be sure, a reasonable fact-finder could conclude that these falls occurred for the same reason as did Chicklas' pre-accident falls. On the other hand, a reasonable fact-finder also could conclude that the falls occurred as a result of the injuries Chicklas suffered in the accident. This creates a genuine issue of a material fact with respect to causation and constitutes another reason why summary judgment is not appropriate.

In light of the above, Defendants' motion for summary judgment with respect to Plaintiff Chicklas is DENIED.

### B. Plaintiff Bergen

As with Plaintiff Chicklas, Defendants do not contest causation or liability with respect to Plaintiff Bergen. They also do not dispute that Bergen's alleged injuries affect an important body function. Rather, Defendants challenge Bergen's ability to establish a threshold injury on two grounds: they argue that her impairments are not objectively manifested, and they argue that her injuries have not affected her general ability to lead her normal life. The Court will address each argument in turn.

#### 1. Objectively Manifested Impairment

As discussed above, in order to recover non-economic tort damages based on a car accident, a plaintiff must show "an objectively manifested impairment." Mich Comp. Laws § 500.3135(7). To be "objectively manifested," an "injury must be capable of objective verification by a qualified medical person either because the injury is visually apparent or because it is capable of detection through the use of medical testing." *Netter v. Bowman*, 725 N.W.2d 353, 362 (Mich. Ct. App. 2006).

Defendants argue that Bergen has not met this threshold because "not one test or physician's examination suggests she sustained an objectively manifested impairment of body function. The only evidence of *any* impairment at all is her own subjective testimony that she has pain and range of motion tests that rely upon her *subjective* response."[15]

---

[15]Defendants' argument verges on disputing the nature and extent of Bergen's injuries. Under *Kreiner*, this would end the Court's inquiry, for if "there are factual disputes concerning the nature and extent of a plaintiff's injuries . . . the court may not decide the issue as a matter of law." *Kreiner*, 683 N.W.2d at 625. The *Kreiner* court also made clear,

16

(Defs.' Mot. at 11.) Defendants position, of course, completely ignores Dr. Rottenberg's report, which discusses spinal and nerve abnormalities revealed by x-rays and electrodiagnostic testing. (Pl.'s Resp., Ex. 6.) Because these impairments were detected through the use of medical testing, they are objectively manifested. Medical records to the contrary do not change this conclusion; at the most, they create an issue of material fact that precludes summary judgment. Defendants' argument on this point is therefore unavailing.

### 2. Bergen's General Ability to Lead Her Normal Life

Defendants also argue that Bergen cannot establish that her injuries have affected her general ability to lead her normal life. Defendants assert that any limitations Bergen currently experiences are the result of her pre-existing elbow problems. Additionally, they note that Bergen has resumed some of the household chores she performed before the accident and that no doctor has restricted her from performing the other chores. They also point out that Bergen "quite simply has made no attempt whatsoever to engage in leisure activities" that she enjoyed before the accident. (Defs.' Mot. at 17.) While all of this may be true, Defendants have not adequately addressed Bergen's current inability to work. They attempt to minimize this fact when they state that, while Bergen's doctor "did permanently disable her from working, given her prior medical treatment and restrictions, her job performance was already severely hampered due to her elbow condition." (*Id.* at 7.) To be sure, Bergen was under certain restrictions at work before the accident. The fact

---

however, that whether an impairment is objectively manifested constitutes a separate step in the Court's inquiry. Because Defendants frame the issue as going to "objectively manifested," and because the Court disposes of the issue on other grounds, the Court will assume that Defendants to not dispute the nature and extent of Bergen's injuries.

17

remains, however, that she was able to work despite these restrictions. Thus, Bergen's pre-accident life included the ability to perform her job.

Defendants cite to a number of cases where courts held that the plaintiff had not established a threshold injury, even though the plaintiffs in those cases suffered injuries that are arguably worse than those suffered by Bergen. Each of those cases, however, is easily distinguishable. For instance, one of the plaintiffs in *Kreiner* was injured in a car accident. *Kreiner*, 683 NW.2d at 621. After the accident, the plaintiff was able to return to work as a carpenter, even though he had to limit his workday to six hours as opposed to the pre-accident eight hours. *Id.* at 622. The plaintiff in *Minter v. City of Grand Rapids*, 747 N.W.2d 229 (Mich. 2008), suffered a broken toe, cervical strain, a mild closed head injury, and a laceration on her face. Over time, the plaintiff's toe and back healed completely, and the laceration resulted in a facial scar less than half an inch long. *See Minter v. City of Grand Rapids*, 739 N.W.2d 108, 110-11 (Mich. Ct. App. 2007).[16] Additionally, the effects of the closed head injury lasted no more than four months, and the plaintiff's post-accident life was essentially the same as it was pre-accident. *Id.* at 235 (Murray, J., dissenting).

In *Jones v. Olson*, 747 N.W.2d 250 (Mich. 2008), the plaintiff was able to return to work (pouring and setting up cement walls) part-time within six months of his injuries, and he began working full-time two-to-four weeks after that. *Id.* at 252. Similarly, the plaintiff in *Swick v. Okorn*, No. 263478, 2005 WL 2862041 (Mich. Ct. App. Nov. 1, 2005), was able to return to work, albeit with certain restrictions. *Id.* at * 1. Likewise, in *Dixon v. Gibson*, No. 245943, 2004 WL 1837735 (Mich. Ct. App. Aug. 17, 2004), the plaintiff returned to

---

[16]Judge Murray's dissenting opinion was adopted as the Michigan Supreme Court's decision in the case. 747 N.W.2d 229.

work full-time "after a few months." *Id.* at * 1. Finally, in *Jones v. Jones*, No. 274627, 2007 WL 3409355 (Mich. Ct. App. Nov. 15, 2007), the plaintiff's injuries "healed nicely," and her doctors placed no restrictions on her activities. *Id.* at * 2.

The obvious, and dispositive, difference between these cases and Bergen's case is that the plaintiff in each case cited by Defendants recovered and was able to return to his pre-accident lifestyle, which often included work. Bergen, on the other hand, is, in Defendants' own words, "permanently disable[d] . . . from working." (Defs.' Mot. at 7.) Further, a Functional Capacity Evaluation determined that Bergen was not capable of sedentary work. Thus, while Bergen may have had restrictions in the activities she could perform at work before the accident occurred, she is currently under a doctor's orders not to return to work at all. This is the type of impairment that affects the course and trajectory of an individual's life. Accordingly, Bergen has presented sufficient evidence to establish that her injuries have affected her general ability to lead her normal life.

Based on the foregoing, Defendants' motion for summary judgment is DENIED with respect to Plaintiff Bergen.

## IV. Conclusion

For the above-stated reasons, Defendants' motions for summary judgment are DENIED.

        s/Nancy G. Edmunds  
        Nancy G. Edmunds  
        United States District Judge

Dated: August 5, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 5, 2008, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager